(67 App. Div. 16.)

PEOPLE v. GOSLIN et al.

(Supreme Court, Appellate Division, First Department.    December 13, 1901.)

1. INDICTMENT—ARREST OF JUDGMENT—APPEAL.

Code Cr. Proc. § 331, enacts that an objection to the jurisdiction of the court over the subject of an indictment, or that the facts stated do not constitute a crime, may be taken not only by demurrer, but at the trial, under the plea of not guilty, and in arrest of judgment. *Held*, that on appeal from an order denying a motion in arrest of judgment and for a new trial, there having been no demurrer to the indictment, objections to the formal sufficiency of the indictment, under sections 275 and 276, and of duplicity, as forbidden by sections 278 and 279, are unavailable.

2. INDICTMENT—SUFFICIENCY—SEVERAL COUNTS.

Where, in an indictment, the same offense is charged in various counts, some of which are defective, but one of which is legally sufficient, a conviction under a general verdict of guilty may be had upon the count that is good.

3. SAME—CHARGING CRIME—EMPLOYING STATUTORY WORDS.

Code Cr. Proc. § 283, enacts that words used in a statute to define a crime need not be strictly pursued in an indictment, but that other words conveying the same meaning may be used. Pen. Code, § 435, enacts that one who, with intent to affect the market price of the stocks, bonds, or evidences of debt of a corporation, knowingly circulates any false statement, rumor, or intelligence, shall be punished by a fine, etc. An indictment alleged that defendants conspired to occasion a decline in the market price of a stock by contriving, propagating, and spreading divers false and injurious rumors, well knowing the premises, and that the injurious rumors would occasion a decline of the stock. *Held*, that the allegation was sufficient.

4. CONSPIRACY TO INJURE STOCK—EVIDENCE—STATUTE.

On a prosecution under Pen. Code, § 435, it was shown that defendant inserted advertisements in a newspaper, from time to time, predicting a fall of the price on the stock, and gave circulation to a report that the company was about to go into the hands of a receiver, and wrote letters to persons stating that a decision would be handed down resulting in the levy of a tax of 2½ per cent. on the gross earnings of corporations. *Held*, that the evidence was sufficient to sustain a conviction.

5. SAME—EVIDENCE.

Where, on such a prosecution, it was shown that defendants had circulated false statements to the effect that the corporation was to go into the hands of a receiver, which was sufficient to sustain a conviction, it was not reversible error to exclude testimony tending to show that some independent corporations controlled by such company were not in sound financial condition.

6. INJURING COMMERCE—CONSPIRACY.

A conspiracy to depress the value of the capital stock of a corporation, dealt in on the stock exchange, is a conspiracy to injure trade or commerce, under Pen. Code, § 168, subd. 6, punishing any conspiracy to commit an act injurious to trade or commerce.

**7. SAME—EVIDENCE—SUFFICIENCY.**

Where it is shown that, pursuant to a conspiracy, defendants circulated false reports to the effect that a certain corporation was about to go into the hands of a receiver, and that a decision adverse to its interests would be handed down, and inserted advertisements in a newspaper predicting a marked fall in the price of the stock, and warning persons to beware of "flour trusts," and it was shown that such term referred to the corporation, the evidence was sufficient to show a conspiracy, within the meaning of Pen. Code, § 168, subd. 6, making it an offense to conspire to injure trade or commerce.

**8. TRIAL.**

On a criminal prosecution, after the evidence had been put in, the court stated to the jury that one of the jurymen had filed an affidavit that he had been offered money to disagree in the case, and that the affidavit charged that the one who offered the money said that another juror had been "fixed," and that the matter was under investigation, and would be investigated, and, if found true, the person who offered the money would be punished, and that the juror who failed to make the statement of it to the court would be punished. *Held*, that it was proper to deny a motion of defendants to dismiss the jury; the motion being on the ground that the information imparted by the court would, perhaps, prevent a fair and deliberate consideration in the case; the court's action having been proper, under the circumstances.

Appeal from trial term, New York county.

Alfred R. Goslin and others were convicted of a conspiracy to injure trade and to depress the value of certain corporate stock, and from the judgment and from an order denying a motion for a new trial they appeal. Affirmed.

Argued before HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Frank S. Black, for appellants.

John D. Lindsay, for the People.

PATTERSON, J. The appellants were, with Henry Bogert and Henry J. Alexander, indicted for a conspiracy to injure trade and to depress the value in the market of the shares of stock of the Brooklyn Rapid Transit Company. The indictment contains nine counts. It is a voluminous document, covering some 125 pages of the record before us, and seems to have been prepared to present in every legal phase the acts of the defendants constituting the offense or offenses with which they are charged. Henry J. Alexander was not tried. The other defendants were duly brought to trial in the supreme court. An acquittal was directed as to the defendant Bogert. The three other defendants, the present appellants, were found guilty upon a general verdict of the jury. They moved in arrest of judgment and for a new trial, which motions were denied by the justice presiding. Thereafter the defendant Goslin was sentenced to six months' imprisonment, and to pay a fine of $500. The appellants Packer and Davis were each sentenced to three months' imprisonment, and to pay a fine of $250. From the judgment of conviction, and from an order denying a motion for a new trial, this appeal is taken.

The learned counsel for the appellants has urged with much ingenuity and earnestness three principal grounds for the reversal

of the conviction of these appellants. The first relates to the alleged insufficiency of the indictment; the second, to the asserted insufficiency of the evidence to sustain the indictment; and the third, to certain remarks of the court made to the jury, and which it is claimed tended to coerce a verdict adverse to the defendants.

1. Matters affecting an indictment that may be argued upon an appeal from an order denying a motion in arrest of judgment and for a new trial are only those which need not have been taken by demurrer. Section 331, Code Cr. Proc. There was no demurrer interposed in this case, so that discussion as to the sufficiency of the indictment must be limited to objections that the court did not have jurisdiction over the subject of the indictment, and that the facts stated do not constitute a crime. Consequently the sufficiency of the indictment, as conforming to the requirements of sections 275 and 276 of the Code of Criminal Procedure, and any criticisms that may be made upon it to the effect that more than one crime is charged in it, within the meaning of sections 278 and 279 of that Code, are not considered on this appeal. It is provided by section 279 of the Code of Criminal Procedure that a crime may be charged in separate counts to have been committed in a different manner or by different means; and, where the acts complained of may constitute different crimes, such crimes may be charged in separate counts. The objection taken by the appellants to the indictment in this case is that no offense is properly charged; that its first six counts are intended to charge a conspiracy, under subdivision 1 of section 168 of the Penal Code, to commit the offense mentioned in subdivision 3 of section 435 of that Code; that the seventh, eighth, and ninth counts of the indictment fail to state facts constituting a violation of any law; that by those counts it is intended to charge a violation of one of the clauses of subdivision 6 of section 168 of the Penal Code, which provides that if two or more persons conspire to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws, each of them is guilty of a misdemeanor. The position taken by the learned counsel for the appellants, therefore, with reference to the indictment, is substantially the following: That it is sought by the indictment to charge the defendants with two separate misdemeanors; that the first six counts of the indictment relate only to a conspiracy to commit the misdemeanor, mentioned in the third subdivision of section 435 of the Penal Code, and that the other three counts relate to the misdemeanor mentioned in the sixth subdivision of section 168 of that Code; and that the indictment is fatally defective because in the first group of its counts it is not stated that the defendants knowingly circulated false statements with intent to affect the market price of stocks, and in the second group it is not charged, in words or in substance, that the overt acts therein mentioned were injurious to trade or commerce, and, further, that it is not therein alleged that the appellants conspired to commit any act of any character to interfere with, impede, impair, or obstruct trade, the allegations being that the defendants

conspired to interfere with the free and natural course of trade, which is not a crime. As we read this indictment, we cannot assent to the distribution and marshaling of its counts in the groups sug· gested by the appellants. To our apprehension, the first, second, third, fourth, seventh, eighth, and ninth counts charge the misdemeanor mentioned in subdivision 6 of section 168 of the Penal Code, and the fifth and sixth counts relate to a conspiracy to violate subdivision 3 of section 435 of that Code. Whatever may be said of the first, second, third, and fourth counts, the seventh count charges all the elements of knowledge and intent necessary to the constitution of the crime, and it is well settled that where, in an indictment, the same offense is charged in various counts, some of which are defective, but any one of which is legally sufficient, a conviction under a general verdict of guilty may be had upon the count that is good. People v. Davis, 56 N. Y. 95; People v. Willett, 102 N. Y. 251, 6 N. E. 301; People v. Dimick, 107 N. Y. 30, 14 N. E. 178. Concerning the fifth and sixth counts, the objection as to them that they do not set forth facts showing that the overt acts of the defendants therein mentioned were injurious to trade is not well taken. The words of the statute defining the misdemeanor intended to be charged in those counts are not set forth therein, but it is provided by section 283 of the Code of Criminal Procedure that words used in a statute to define a crime need not be strictly pursued in the indictment, but other words, conveying the same meaning, may be used. Equivalent words are contained in the counts now under consideration. The words of section 435, Pen. Code, are that "a person who with intent to affect the market price of the public funds　*　*　*　or of the stocks, bonds or other evidences of debt of a corporation or association　*　*　*　knowingly circulates any false statement, rumor or intelligence is punishable by a fine," etc. In the fifth count of this indictment the allegation is that the defendants conspired "to occasion a fall and decline in the market price of said stock by contriving, propagating, and spreading divers false and injurious rumors, statements, imputations, and insinuations regarding and impugning the affairs, management, and financial condition of the said Brooklyn Rapid Transit Company,　*　*　*　well knowing the premises, and knowing, moreover, that false and injurious rumors, statements, imputations, and insinuations regarding and impugning the affairs, management, and financial condition of the said Brooklyn Rapid Transit Company　*　*　*　would occasion a fall and decline in the market price of its stock." The sixth count is substantially the same as the fifth. Those two counts, by the use of the words "contriving, propagating, and spreading," charge the full equivalent of the statutory word "circulating," and they further charge motive, intent, and guilty knowledge. We are therefore of the opinion that, so far as the counts of the indictment are concerned, each of the misdemeanors is sufficiently charged, and that the objections to the indictment were properly disposed of in the court below.

2. A perusal of the record makes it difficult to perceive how either a moral or legal doubt could arise concerning the sufficiency of the

evidence to sustain both charges made in the indictment. The conspiracy and the acts done in pursuance thereof are made to appear as plainly as any crime can be established by what is called "circumstantial evidence." Without stating that evidence in detail, its prominent features are that the defendants Goslin and Packer, in concert, began some time in the month of October, 1899, an attack upon the Brooklyn Rapid Transit stock. On the 20th of that month an advertisement appeared in newspapers in the city of New York, signed, "Truth Seeker, Post-Office Box 1488," in which, after alluding to the stock of another corporation, the advertiser says:

"I also advised the sale of Brooklyn Rapid Transit from 125 to 95, and made thousands of dollars for thousands of clients. Between fits and starts, this stock will yet see 50. I act only upon the most absolutely correct information, not on every slightest breeze that turns the heads of other operators. Do you care for such advice?"

On the 27th of October another advertisement was inserted in the New York papers, stating:

"I advised the sale of Brooklyn Rapid Transit from 125 to par. It immediately dropped to 74, and is now 86."

The last advertisement was signed, "Truth Seeker, Post-Office Box 1488, New York City." On the 29th of October, 1899, another advertisement appeared, stating, among other things:

"Four months ago I advertised the sale of Brooklyn Rapid Transit from 125 to par. It immediately declined to 74, and is now 86."

Similar advertisements were published at other dates. On December 21, 1899, an advertisement was inserted in the New York papers, signed, "Truth Seeker, Post-Office Box 1488," as follows:

"Beware of flour trusts. One of them caused the wreck of a trust company to the tune of $11,000,000. There are other 'flour trusts.' Trust not in them. They sell stock to their friends. The only thing to recommend the stocks is their price. So they put the price up. Their friends bought, and the friends of their friends, and yet their friends, until the entire population was loaded. And the higher the stocks, the more the public bought. * * * Sell B. R. T. at any figure above 20, and communicate with me. I will keep you posted on the real outlook. When Brooklyn Rapid Transit sold at 130 and 120, I publicly advised its sale for 60, and made millions for my followers. I now tell you B. R. T. will fall to 20. An expert analysis of the company's finances shows it is earning a deficit, with prospects of increasing its earnings in this direction as it goes along."

It is shown in the proofs that the Brooklyn Rapid Transit stock was included in what is referred to as the "flour trusts." It is also shown that, prior to the attacks made upon this stock by "Truth Seeker," it was selling at 125. It fell rapidly thereafter. It is also shown in the evidence that "Truth Seeker" was the defendant Goslin. The defendant Davis seems to have entered into the confederacy in December, 1899, and thereafter the three parties became very energetic in their efforts to depress the stock. A great many telegrams were sent to various persons in different parts of the country urging them to sell the stock at the opening of the market on the next day for 30 points profit. Those telegrams were signed, "Truth Seeker," and were sent out on the 20th of October. On the 21st of October, the "flour trusts" advertisement appeared in

various newspapers in the city of New York, including one of which the defendant Davis appears to have been the editor. That advertisement was answered by various people, and the letters re-·ceived from them were replied to by the defendant Packer, using the name of "John H. Harmony." In his replies to those letters he stated as follows:

"Brooklyn Rapid Transit is still a sale, and will decline to twenty dol-'lars per share in the near future. A decision will be handed down by the supreme court within a few days which will declare that the Ford bill means .a tax of two and one-half per cent. (2½%) upon the gross earnings of corporations."

About the 20th of December, 1899, both Goslin and Packer gave ·circulation to a report that the Brooklyn Rapid Transit Company was going into the hands of a receiver. Davis and Goslin consulted together with reference to the institution of a suit for the appointment of a receiver. It appeared by the testimony of the counsel for the rapid transit company and its vice president that no papers had been received, nor did they have any knowledge or information upon the subject of an application for a receivership on the part ·of the company or anybody else. The company, harassed and seriously affected by the machinations of the defendants to injure it, offered a large reward for the detection and conviction of persons ·engaged in the conspiracy, and then the idea was conceived by the ·defendants to enjoin the company from paying it. Goslin and Davis were both concerned in this scheme, and a man named Allen was induced to bring a suit for an injunction to restrain the payment of the reward, and actually procured an injunction, which was subsequently dissolved. The evidence clearly connects Goslin, Packer, and Davis with all the acts, some of which, only, have been referred to in general outline, and establishes incontrovertibly that the advertisements signed, "Truth Seeker," were prepared and published in pursuance of a conspiracy; that the telegrams sent ·throughout the country were also in pursuance of that conspiracy; that the Harmony letters were in furtherance of it, as was also the report concerning a receivership of the Brooklyn Rapid Transit Company. The conviction as to circulating false rumors with the intention of depressing the market value of the stock is plainly to be supported upon the false statements that the company was to go into the hands of a receiver, and that a decision would be handed down by the supreme court which would declare that the Ford tax bill meant the tax of 2½ per cent. upon the gross earnings of corporations. There was evidence offered also by the prosecution to prove that the Brooklyn Rapid Transit Company was a solvent ·corporation. The defense, upon the examination or cross-examination of witnesses, offered to show that some of the independent corporations which were controlled or operated by the Brooklyn Rapid Transit Company were not in sound financial condition, and that the properties acquired by that company were of such a character that justification could be made of the statements regarding its embarrassed and unsound condition. Certain questions were not .allowed to be put by the justice presiding at the trial, principally

upon the ground that they were immaterial. The exceptions taken to the rulings of the court in this regard need not be considered, but it may be said, in passing, that most of these questions, in the form and manner in which they were put, were objectionable. Some of them were proper, but testimony was allowed as to the business of certain of the corporations resulting in a deficit; such testimony being allowed within reasonable limitations imposed by the court. But, independently of any consideration relating to an inquiry as to the condition of the several companies operated by the Brooklyn Rapid Transit Company, the falsity of the statements of the defendants concerning a receivership, and proof that the defendants circulated those false statements, is sufficient to sustain a verdict under the fifth and sixth counts of the indictment, and therefore the exclusion of the testimony above referred to was not reversible error. As said before, the evidence concerning a conspiracy to injure trade is overwhelming; and it cannot seriously be contended that a conspiracy, under such circumstances as are disclosed in these proofs, to depress the value of the capital stock of great corporations, dealt in on the stock exchange, is not one to injure trade or commerce.

3. After the evidence both for the prosecution and the defense had been put in, and counsel had addressed the jury, the court, preliminarily to ordering a recess, spoke to the jury as follows:

"Gentlemen, we are about to take an adjournment for lunch. You will not be permitted to separate now. One of your number has filed an affidavit that he has been offered money to disagree in this case. The affidavit charges that the person who offered the money said that another juror had been 'fixed' in this case. The matter is under investigation. It will be thoroughly investigated, and, if it is found to be true, the person who offered the money will be punished, and the juror who failed to make the statement of it to the court will be punished. I renew the caution that I have heretofore given you. You will now be put in the custody of officers who will furnish you with your lunch."

Thereupon the recess was ordered, and, upon the reassembling of the court, counsel for the defendants moved that the jury be dismissed from the further consideration of the case—

"Upon the ground that the information imparted by the court, and the statement made by him, will have a tendency to affect, and perhaps prevent, the fair and deliberate consideration of this case on the part of individual jurors."

To which the court rejoined:

"I cannot think it will have any such effect. It certainly ought not to have any such effect, and, as far as I am able to advise the jury, they will be advised that it must not have any such effect, and should not have any such effect. I wish, as far as possible, to protect the rights of the defendants as well as the people. It has not been intimated by anybody, as yet, in whose behalf this alleged proffer was made to the juror who made the affidavit. There is nothing before the jury to indicate that the accused are involved in it, any more than to indicate that the prosecution, or some one behind the prosecution, is involved in it."

Counsel for the defendants then said:

"My motion is put with precisely that understanding, your honor. Your honor denies the motion?"

The court replied:

"So that, unless the other side consents, I can hardly think it is a mistrial. I do not think it will affect, as it certainly ought not to affect, the result. It was designed merely to caution the jury specially,—to give a reason for doing it, and for taking the very unusual course of keeping them together at that stage of the case,—that I stated to them what was within the knowledge of one of these jurors at the time, or at least one of the jurors."

An exception was then taken to the refusal of the court to grant the motion.

We do not think this episode presents matter constituting legal error. There was no effort on the part of the court to coerce the jury to render a verdict. It seems to us that the justice presiding in a very extraordinary emergency acted with judgment and discretion. When the affidavit to which he referred was presented to him in the course of the trial by a juror impaneled in the case, it was for him either to ignore it or to take some notice of it. What the court said could certainly have no influence upon the mind of the juror who made the affidavit. All the court did was to notify the jury that it had become authoritatively informed that sinister influences were at work to corrupt some of their number, and that therefore the unusual course was pursued of keeping them together until the case could be finally submitted to them. The situation was one that called for the exercise of sound judgment as to the course to be pursued, and when the jury reassembled after the recess the court very clearly instructed them that their deliberate consideration of the case was not to be affected by the communication he had made. It was intended as a warning, and not as coercion, and could not have affected the honest judgment of honest jurors; and we think the justice was right in denying the motion to discharge the jury and withdraw the case, for, had he done so, the object of the person tampering with the jury would have been fully accomplished.

The judgment and order should be affirmed. All concur.